*Court of Common Pleas, Lebanon County, April 21st, 1862.*

### BLEWETT *v.* COLEMAN ET AL.

A lease for more than three years made by an agent without any authority in writing, confers no more than an estate at will on the lessee. Where a tenant at will was only permitted to mine ore within certain limits, he has no right to take any outside of them.

Where one of several tenants in common destroys the works of a tenant of one of the others, under the belief that he is a mere trespasser, the former is only liable for the injury actually done; it is not a case for vindictive damages.

Coleman *v.* Blewett (4 Wright, 45) referred to.

BY THE COURT.—These two actions, one trespass *de bonis asportatus*, the other trespass on the case, for interrupting the plaintiff in his mining operations, must be determined by you on the evidence submitted.

If the plaintiff is entitled to recover in the first, and principal action, you will probably find that he is in the second also, as both depend on the same general facts and identical legal principles.

(Here the court called the attention of the jury to the history of the respective titles of the Messrs. Grubb and Robert Coleman, deceased, and the proceedings in partition, and then stated:) The writing of the 30th of August, 1787, shows that the parties then owning this estate considered that partition could not be made of the ore-banks without doing manifest injustice to some of the parties. Why? Because as we conceive that as no one could tell what ore was within the respective hills, either in quality or quantity, the division would only be conjectural, and hence great injustice might be done. To value the ore-banks, and permit the older title to take them at the valuation, and the iron-works assigned to the other co-tenant to be left without ore, would be equally unjust. That no difficulty was felt because the distance to which the ore extended was unknown, is very clear, as there was another remedy provided to meet it,—by declaring that if found to extend beyond the limits of the survey lately made by Thomas Clark, the parties were to have permission to mine and remove it. A method of working the mines was then agreed on, to wit, by each part-owner occupying his own mine-hole without interruption; and although we consider these tenants in common accountable to each other for the ore mined, yet an action would lie by any one of them against another for disturbing him in his mine-hole.

The survey of Thomas Clark was well known to the parties at the time, and also that it embraced all that portion of the three hills then worked, and a great deal more than had been worked. That it did not embrace the whole of the hills, and that ore was believed to extend beyond it is very clear, else the parties would not have made the supplemental agreement. This survey was below all the openings then made, and it is believed that no regular mine-holes of iron ore yet extend much beyond it. The diggings complained of in the former actions were not regular mining, but occasional digging for what was called "nigger heads"— detached masses of iron ore. The only contest in that case was, whether the defendants, to make out a justification, must show that there was a continuous vein of iron ore, connecting within and extending without the Clark survey; or whether there was a general right to mine beyond it, without showing the connection. The jury was instructed in express terms that whether the mining was within or without the lines of the Clark survey was unimportant in that case, as the parties had a right to mine outside as well as within those lines, but they were requested to find whether the mining was on the in or the outside, for the purpose of saving further litigation, if the Supreme Court should differ with this court in the construction of the agreement of 1787. We considered the evidence then exhibited clear and demonstrative, that the draft produced was the one made by Thomas Clark, and referred

to in the agreement. It is proved to be in his handwriting, that he died some time between 1806 and 1810; there was no pretence that he ever made more than the one survey of the mine-hills, and that was done in presence of the owners, at the time of the partition. All the parties in interest lived much longer than Thomas Clark, and had any subsequent survey or change of the lines been attempted, they would have known of, and prevented it. The early owners all ‘knew of and respected the lines, and down to about 1848 or 9, there was neither a necessity or disposition to go beyond them.

The general survey of the Cornwall estate showed where the portion left undivided was cut out. In 1845 or 6, Esq. Weidle (a most careful and accurate surveyor), with the draft of the Cornwall estate in his hand, went upon the ground, and starting at a known corner, measured out a distance to the "Clark survey," and then ran it off, setting in substantial cedar stakes as landmarks. In making the survey he found the various small streams of water marked on Clark's draft correspond precisely therewith. Also, two roads, proved by the ancient witnesses examined on the trial to have been in use in 1787, and never changed, to be as marked, so that there could be no reasonable, scarcely a possible, doubt as to the correctness of his location. No one gainsayed or contradicted it, and Weidle's survey had always been treated as a correct exposition of the Clark lines, even by the present owners. It was not admitted on the first trial; the defendants merely said, prove and establish your survey.

The court considered the evidence so clear and demonstrative that had it been a material point in the cause, and the jury had found against the survey, we would have set aside the verdict. It seems to be settled by the Supreme Court in this case that if a jury is requested to find the location of a line or survey, and reports to the court that they are unable to agree thereon, that it is to be conclusive in all time to come that the line or survey cannot be found, although the next jury charged with the subject has no difficulty in fixing the location. This principle has at least the recommendation of novelty, if it possesses no other.

It is well known to all who are conversant with jury trials, that some juries will find facts without, or against evidence, whilst others will not find them even on the plainest evidence. We must all concede the principle that where a natural and artificial boundary are called for, the former must prevail, as where a line on the bank of a river is designated, the river is the true boundary of the survey, but we are not aware that the principle was ever applied to anything so indeterminate as a hill. Possibly if one were to convey a certain hill, without other description, it would include the whole hill, if the grantor owned so much; but if the deed were for a hill according to a particular survey, it

[Blewett v. Coleman et al.]

would not extend beyond the survey, although some parts of the hill reached further before coming to the dead level. It would generally be more difficult to determine where the hill ceased, than to discover the artificial lines. The case under consideration is not even so strong as the one put by way of illustration. Here the parties in interest were engaged in carrying on various iron-works, and on the upper portion of a very large hill had been in the practice of mining iron ore. There were also two other hills in the vicinity, of smaller size, in which some ore was also mined. The first agreement submitting it to certain men to make partition, dated May 6th, 1786, in several different places, speaks of the object now in dispute, as "the ore-banks belonging to Cornwall Furnace." It nowhere mentions the *hills*.

In the after agreement, made on the 30th day of August, 1787, reciting the difficulty of making equal partition, it is agreed that "the ore-banks belonging to Cornwall Furnace shall remain together and undivided as a tenancy in common, and it is agreed that an accurate survey shall be made of the ore-banks and hills, if not already done, and the agreement made on the same day speaks of them as the ore-banks and hills, recites the survey made by Clark, gives ingress and egress to the parties who shall not retain the Cornwall estate to the said mine-hills, and secures free and uninterrupted liberty and power to dig, sink shafts, drive drifts, raise and carry away any ore that may be found to extend beyond the limits of said survey." Now any one who is acquainted with these mines knows, that until within a very few years, no mining was done so low on the hillside as the point claimed as the "Clark survey." The main object of this portion of the agreement was to secure a division of the iron mines; it was considered barely possible that ore might be found in the hill below, but that was provided for in terms by enabling them to sink shafts and drive drifts beyond the limits of the survey. We consider the iron mines the major, and the hills the minor, part of the description, as it is self-evident that the parties did not mean to leave the *whole* hills as a tenancy in common, but only that part known to contain the iron mines, whilst at the same time they provide for the contingency of finding ore in unexplored places. The construction put on all of these writings by the Supreme Court subverts the intention of the parties, as it leaves the whole of the hills (only a portion of which was known to contain ore and was used for mining purposes) as a tenancy in common, whilst it extends the privilege of driving drifts, sinking shafts, and mining ore, throughout the whole Cornwall estate, and ignores the survey made by Thomas Clark entirely.

We must, however, take the decision of the Supreme Court as the law of the land, and of this case, and you must take the law from this court. We, therefore, instruct you that the Messrs.

Grubb are tenants in common of the whole of the hills in which these mines are situated, down to their very base, and also possess the right of mining iron ore on any part of the Cornwall estate, wherever found, without the least regard to the "Clark survey;" and it matters not whether all the parties in interest did or did not recognize the survey made by Clark as their boundary for sixty years, and whether that made by Weidle in 1845 or 6 was or was not run on the same lines, and practically recognized by the parties in interest ever since, the hills themselves must be taken as the limits of the parties' rights, and Edward B. Grubb and Clement B. Grubb are tenants in common with R. W. Coleman in the whole thereof, of course having an equal right with him to mine and occupy the same for every purpose. This case must turn on questions unconnected with the tenancy in common.

Benjamin Blewett claims to have mined the copper ore in dispute under a lease made to him by Joseph Eckman, as agent for Edward B. Grubb and Clement B. Grubb, dated November 14th, 1857, which was to extend for a period of 5 years, the tenant paying a rent of 10 per cent. for all copper ore mined. No valid authority is shown in Eckman to make such a lease, as the same must be in writing. Neither a prior power nor a subsequent ratification are shown on the part of Clement B. Grubb. Eckman testifies to none, Grubb proves that none existed; the lease is consequently void as to him. There is nothing which we can lawfully submit to you showing any authority from Clement B. Grubb; as to him Blewett is a mere trespasser. A small writing has been given in evidence, signed by Edward B. Grubb, agreeing to pay Eckman a salary for attending to his interests at Cornwall and elsewhere, dated March 26, 1856, but it does not confer any power to make this lease. We must look to the parol evidence alone for the authority, and to the acts and declarations of Mr. Grubb to see if it was confirmed, for a subsequent ratification is often equivalent to an original command. (Here the court called the attention of the jury to the testimony of Mr. Eckman and Mr. E. B. Grubb, also of C. B. Grubb, and then proceeded :) The lease exhibited in evidence being for more than three years, and made without any authority in writing, can have no greater effect than a lease at the will of the lessor. Eckman does not testify that he had power to make one for any particular time, whilst E. B. Grubb declares that he only authorized Eckman to make a lease at will, and never knew that any other had been given until the year 1860, when he saw this for the first time, and immediately repudiated it.

Although Mr. Eckman's testimony tends to show that Blewett was to have a larger and more certain interest than a tenancy at will, yet that of Mr. Grubb is very positive that no other

lease was authorized.    The lease granted for five years is clearly
within the statute of frauds, and no greater estate than a tenancy
at will can be decreed by the court on the uncorroborated tes-
timony of a single witness, when expressly contradicted under
oath by the opposite party (Greenlee v. Greenlee, 10 Harris,
225).

Taking Mr. Blewett to be a tenant at will of Edward B.
Grubb (and the testimony makes him that at least), what are his
rights?    Clearly to mine and raise ore until the will is deter-
mined.    It is not necessary for us to say whether the tenant,
continuing to use and occupy the premises at the will of the
landlord for more than a year, changed his tenure to that of a
lease from year to year, or otherwise; as a tenant at will has
clearly the right to remove the ore which he has severed from
the freehold during his tenure, and before the landlord has de-
termined his will, and given notice thereof to the tenant.    Ed-
ward B. Grubb, as owner of one undivided twelfth part of the
mine-hills, could lawfully make a lease to Blewett, which would
authorize the latter to mine; and had it been in terms a lease at
will, neither of the other co-tenants in common could determine
that will; it could be done by Edward B. Grubb alone.    Robert
W. Coleman, owning and representing more than one-half of the
interest in the mines, gave him no additional right.    His remedy
was not to seize the ore mined under the lease at will, but to
look to his co-tenant in common for the value of the article, pre-
cisely the same as if Mr. Grubb had mined it himself.    There is
another important point for your consideration, and one on
which this cause mainly turns.    Edward B. Grubb swears posi-
tively that Eckman had leave from him to allow Blewett to mine
copper ore within certain lines or limits, alleged to be the lines of
Clark's survey.    In his instructions, he says he especially con-
fined him to the limits or lines of " Clark's survey," and not to
go beyond them.    " To the lines or limits of Clark's survey, as
laid down by Mr. J. Weidle, who put the corners on the ground."
He throughout declares that his instructions were special and
particular, not to go beyond those lines, because he considered
his rights different within and without those limits: an owner
within, and accountable to his co-tenants; possessed of a mere
right to dig without, and not accountable in the same way, if at
all; to reach which conclusion, he probably reasoned that, as the
act of Assembly gave a remedy between tenants in common, and
none against those holding an incorporeal right, he could not be
called on to respond to the others.    He further says, that as they
were not mining without those lines, he would not commence in
advance of them.    He testifies that he never did know that
Blewett was mining outside of the line run by Weidle, until Mr.
Eckman furnished him the statement to lay before the master in

chancery, which distinguished between what was obtained within, and what without those lines, and that he directed Eckman to at once order Blewett to cease mining outside.   It also seems that all of this ore was mined after that time.

On the other hand, Eckman testifies that no such restriction was given in making the lease; that the authority was general, without any limit being mentioned, and that Grubb was on the ground and could not help seeing and knowing that the mining was done outside of the "Weidle survey." That Grubb never did require him to have the mining done within those lines, no mention being made of them, and that he never did tell Blewett not to mine where he did, or notify him to cease so mining; was never directed so to do by Grubb.   This is a question of credibility between the witnesses, and it is peculiarly your province to determine which is correct.   There are a number of witnesses who testify to Eckman's statements as to what he said he told Blewett as to not mining where he sunk his shaft, and that he did it at his peril, but all of this is denied by Eckman.   You must determine whether he or they speak the truth.   Much of this conversation took place in presence of Mr. Coleman, when he was about to remove the ore, and the jury may very naturally infer that the previous information given to him by the Messrs. Grubb, as to having given no permission to Blewett to mine at that place, and what was said by Mr. Eckman when called on to confront the parties, led to that removal.   This whole case turns almost entirely on the correctness and credibility of Mr. Eckman.

Under the decision of the Supreme Court, it appears that Grubb was not only a tenant in common of the land within the limits of the "Clark survey," but of the whole of the three hills, on the side of one of which it is conceded that this ore was mined.   Consequently when a lease was made to Blewett as a tenant at will, he was unrestrained as to location, unless limited by the lease, and this limit the owner had a right to fix if he saw proper.   He could do it by any line he chose to designate, and if Grubb directed Eckman to lease to Blewett within the limits of the "Weidle survey," and no further, the latter would have no right beyond that line.   Where an agent has a special and limited power, those who deal with him do it at their peril. They must see that the authority of the agent extends to doing the act which he undertakes to perform, and this is more emphatically the case when the power is required by law to be in writing, as in the present instance.   If, in authorizing Eckman to make a lease or contract with the plaintiff, to mine copper ore, Edward B. Grubb, in terms, directed him to be confined within the limits of the "Weidle survey," and did no act confirming his mining outside, and so soon as it was known he was so doing,

immediately revoked his power, and ordered him to desist, his act was without authority, and conferred no interest in the ore mined. On the contrary, if Grubb's direction to his agent was so loose and equivocal as to mislead him, inducing him to suppose that he had an unlimited license as to locality, and the agent made the contract in good faith within what he believed to be his authority, the act is binding on the principal, and the ore was mined under his license, provided it was done before the tenant had notice that he must not mine outside of those lines. If the ore was mined without any authority, which it would be if outside of the demised premises, either of the tenants in common could justify its seizure, and prevent its removal. Of course the part-owner seizing it, would hold the ore in trust for all.

It has been contended that the defendant, being a tenant in common of the land, trespass *quare clausum fregit* will not lie against him for removing ore mined on the common property. We do not consider the position sound; for where one tenant in common ousts another from the common property, trespass *quare clausum fregit* will lie. And where one seizes the entire custody of a personal chattel, and sells or converts it to his own exclusive use, trespass *de bonis asportatis* will lie. In the present case the evidence shows that Mr. Coleman tore down the plaintiff's shanty, hauled off the ore he had mined, sold it, filled up the shafts, and, to all intents and purposes, ousted him from the possession and converted the avails of his labor to the use of himself. The case, as we conceive, turns solely on the fact of whether Blewett was or was not limited in his lease or right to occupy as a tenant at will of Edward B. Grubb to the lines of the survey made by Weidle, or leased without being restricted to any limits. If the plaintiff is entitled to recover in the first action, we see no reason why he cannot in the second also; both depend on the same facts and principles. If the plaintiff was restricted to the Weidle lines in his mining, he was also in sinking his shafts and locating his shanty. If he was not so restricted, he can recover the actual damage sustained from filling up the shaft, tearing down the shanty, and interrupting his business.

If you find a verdict in favor of the plaintiff, we do not consider this a case for anything more than compensatory damages, for although the measure of forcibly hauling off the ore mined by the plaintiff, tearing down his shanty, and filling up his shafts, was pretty high-handed, yet before doing it, Mr. Coleman applied to both the Messrs. Grubb and had their assurance by letter that Blewett was mining there without authority from them, and both swear to the same fact now. Mr. Coleman, as a principal owner of the premises, was, therefore, to some extent, excusable in endeavoring to save his own and his brother's property from illegal removal, they owning 50.96 of the whole. More especially is

this the case if before the act he called on Mr. Eckman, who then declared that he had told Blewett if he mined there it was at his peril. The question of damages is, however, entirely for the jury. These instructions, with the answers to the points, will embrace all the questions of law raised in the case.

AFFIRMED BY THE SUPREME COURT (7 Wright, 176).

*Darlington and Funck, for plaintiff.*

*Boughter and Reynolds, for defendant.*